UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DEBBIE KVINLAUG, | ) | |
| | ) | |
| Plaintiff, | ) | 09 C 3511 |
| | ) | |
| vs. | ) | Judge Feinerman |
| | ) | |
| CLAIRE'S STORES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Debbie Kvinlaug brought this action against her former employer, Claire's Stores, Inc.,

alleging that Claire's wrongfully denied severance benefits owed to her under the parties'

Termination Protection Agreement. The court dismissed Kvinlaug's state law claims, leaving

only her claim under § 502(a)(1)(B) of the Employee Retirement Income Security Act

("ERISA"), 29 U.S.C. § 1132(a)(1)(B). 2010 WL 1325552 (N.D. Ill. Mar. 29, 2010) (Guzmán,

J.). After denying the company's summary judgment motion, 2010 WL 5157390 (N.D. Ill. Dec.

14, 2010), *as amended*, 2011 WL 1676048 (N.D. Ill. May 2, 2011), the court held a five-day

bench trial on the ERISA claim. Pursuant to Federal Rule of Civil Procedure 52, the court enters

the following Findings of Fact and Conclusions of Law. To the extent that any Findings of Fact

may be considered Conclusions of Law, they shall be deemed Conclusions of Law, and to the

extent that any Conclusions of Law may be considered Findings of Fact, they shall be deemed

Findings of Fact. After considering the admissible evidence and assessing the credibility of the

witnesses, the court finds that Claire's did not breach the Termination Protection Agreement and

therefore enters judgment in its favor.

**Findings of Fact**

A.    **Kvinlaug's RSM and TVP Assignments Prior to Moving to Europe**

    1.    Kvinlaug was hired by Claire's in May 1998 as a Regional Sales Manager ("RSM") for the Midwest territory. Tr. 31:6–32:7 (Kvinlaug); Doc. 192 at p. 1, ¶ 1.

    2.    RSMs are responsible for overseeing the performance of District Sales Managers in their territory, accompanying them on store visits, and conducting training. When Kvinlaug was hired, she resided in St. Louis, Missouri. Tr. 32:8–33:7 (Kvinlaug).

    3.    In 2003, Kvinlaug was promoted to Territorial Vice President ("TVP") and relocated to Atlanta, Georgia. TVPs are responsible for managing a team of RSMs and overseeing store operations. Tr. at 33:13–34:1, 35:4-13, 44:13–45:17 (Kvinlaug); Def. Exh. 26; Doc. 192 at p. 1, ¶ 2.

    4.    As a TVP, Kvinlaug spent most of her time traveling to different stores and meeting with her RSMs. Kvinlaug typically traveled Tuesday through Friday across her territory, with more extensive travel during the holiday season. Tr. 34:2-21 (Kvinlaug).

    5.    At the outset of her tenure as TVP, Kvinlaug's territory included Georgia, Alabama, Florida, North Carolina, South Carolina, Tennessee, Mississippi, and Puerto Rico. Tr. 33:15–34:1 (Kvinlaug); Doc. 192 at p. 1, ¶ 2.

    6.    As a result of a 2005 territory realignment, Kvinlaug's territory included Georgia, Alabama, parts of Florida and Tennessee, Mississippi, Louisiana, Texas, Oklahoma, Arkansas, Missouri, and Kansas. Tr. 932:22–933:1 (Collins); Doc. 192 at p. 1, ¶ 3.

-2-

7.      As a result of a January 2006 territory realignment, Kvinlaug's territory included Georgia, Alabama, parts of Florida and Tennessee, Mississippi, Louisiana, Texas, Oklahoma, Arkansas, Illinois, Iowa, and Wisconsin.  Tr. 933:2-16 (Collins); Doc. 192 at p. 1, ¶ 4.

8.      Kvinlaug earned an annual base salary of about $105,000 when she started as a TVP.  In 2006, Kvinlaug earned an annual base salary of $165,000 and received a $49,000 bonus.  Tr. 38:14-19 (Kvinlaug); Doc. 192 at p. 1, ¶¶ 5-6.

9.      Between 2003 and June 2005, Kvinlaug reported to Lisa LaFosse, who at the time was Senior Vice President of Store Operations.  In June 2005, LaFosse moved to Europe as Group President for Austria, France, Germany, Portugal, Spain, and Switzerland.  Tr. 37:5-12, 38:1-3 (Kvinlaug); Tr. 365:6-11, 368:18–369:1 (LaFosse).

**B.      Kvinlaug's Assignment as Executive Group Vice President in Europe**

10.     In May 2006, Kvinlaug was assigned to a temporary position in Europe called Executive Group Vice President for Austria, France, Germany, Portugal, Spain, and Switzerland ("EGVP").  Joint Exh. 4; Tr. 38:20–47:4 (Kvinlaug); Doc. 192 at p. 1, ¶ 7.

11.     Claire's created the position for the sole purpose of Kvinlaug's assignment.  No other Claire's employee has held that position.  Tr. 234:24–235:17 (Kvinlaug).

12.     Kvinlaug was given an "Assignment Letter" that described the EGVP assignment. The letter says that the location of Kvinlaug's assignment was "Paris, France," that the assignment was "[u]p to three years in duration," that Claire's "will pay for the cost of upkeep to your home in Georgia," and that Kvinlaug would be "[a]ssigned a comparable position for Claire's North America upon completion of assignment and return to the U.S."  Joint Exh. 4. Kvinlaug understood that her assignment was to last for three years or less and that it had no

firm conclusion date; she represented the assignment's temporary nature on her federal tax forms and in signing a temporary work visa issued by France. Tr. 257:23–260:17 (Kvinlaug); Def Exh. 1; Def. Exh. 32 at KVINLAUG-1062; Def. Exh. 34 at KVINLAUG-1143.

13.     The Assignment Letter stated that Kvinlaug's duties were to "oversee and manage the daily functions of the Field operation," "[s]upervise employees and coordinate their activities," and "[d]evelop and train employees on Claire's' 'best practices,' including store planograms, customer service, and expense control." Joint Exh. 4.

14.     Kvinlaug, LaFosse, and Joe DeFalco, the Senior Vice President of Global Human Resources, met to discuss Kvinlaug's duties as EGVP. Tr. 41:19–43:1 (Kvinlaug); Joint Exh. 4. At that meeting, Kvinlaug was "presented" with the Assignment Letter and she "accepted [it] as presented." Tr. 46:18-21 (Kvinlaug).

15.     Kvinlaug admitted at trial that the Assignment Letter's job description said nothing about "store operations" and that the EGVP position described in the Assignment Letter was similar to the TVP position. Tr. 248:21–249:11 (Kvinlaug).

16.     Kvinlaug began working and living in France in August 2006. Tr. 42:4-6, 53:19 (Kvinlaug).

17.     Kvinlaug reported to LaFosse upon her arrival in France. Tr. 46:22-24 (Kvinlaug).

18.     When she started as EGVP, Kvinlaug received an annual base salary of $250,000, was eligible for a bonus, and was granted eight to ten weeks of paid vacation. Tr. 45:23–46:13 (Kvinlaug); Doc. 192 at p. 1, ¶ 8. In 2007, Kvinlaug received $119,987 as a discretionary bonus.

Tr. 236:7-8 (Kvinlaug). In April 2007, Kvinlaug's annual base salary was increased to $300,000. Tr. 195:5-12 (Kvinlaug); Doc. 192 at p. 2, ¶ 9.

19.     Claire's provided Kvinlaug with a furnished apartment in Paris, a parking space, and a BMW automobile. Claire's also paid Kvinlaug $200 per month to maintain her residence in Atlanta. Tr. 46:6-13 (Kvinlaug); Tr. 773:11-19 (DeFalco); Doc. 192 at p. 2, ¶¶ 10-11.

20.     Claire's provided Kvinlaug with an accountant and reimbursed her for any European taxes she incurred that exceeded the taxes she would have been required to pay had she worked in the United States. Tr. 773:15-19 (DeFalco); Doc. 192 at p. 2, ¶ 12; Joint Exh. 4.

C.     **The Termination Protection Agreement and Addendum**

21.     On December 15, 2006, Kvinlaug and Claire's entered into a Termination Protection Agreement ("TPA"). Joint Exh. 1; Tr. 109:13-24 (Kvinlaug); Doc. 192 at p. 2, ¶ 13.

22.     Kvinlaug did not negotiate the terms of the TPA or seek to change any of the terms presented to her. Tr. 342:24–343:3 (Kvinlaug).

23.     The purpose of the TPA was to encourage Kvinlaug to remain with Claire's in the event of a "Change in Control" and to provide Kvinlaug with fair and reasonable protection from the risks inherent in a Change in Control, such as termination or demotion. Joint Exh. 1 at p.1. The TPA provided that it would "remain in effect for two years following the Change in Control." *Id.* at § 2.

24.     The TPA provided that if Kvinlaug resigned for "Good Reason" after a Change in Control, she would be entitled to certain benefits, including: (1) payment of 1.5 times her base salary immediately prior to the change in control; (2) payment of 1.5 times her Target Bonus; (3) 18 months of continued health benefits; (4) cash payment of accelerated equity incentive awards;

-5-

(5) cash-out of any Deferred Compensation Plan; and (6) payment of any deferred annual bonus payments. *Id.* at §§ 3-4 & Sched. A, § XI.

25.    The TPA provided that Kvinlaug would be entitled to such benefits only if she resigned within "one year from the time [she] first becomes aware of the existence of a Good Reason to resign for Good Reason." *Id.*, Sched. A, at § X.

26.    The TPA defined "Good Reason" as "any of the following actions on or after a Change in Control, without Executive's express prior written approval":

> (1)    any materially adverse alteration in Executive's title or in the nature or status of Executive's responsibilities or conditions of employment from those in effect immediately prior to such Change in Control;
>
> (2)    a reduction in Executive's Base Salary and/or Target Bonus;
>
> (3)    the relocation of Executive's principal place of employment to a location more than 35 miles from such location, except for business travel substantially consistent with Executive's business travel obligations prior to the Change in Control;
>
> (4)    the failure of any successor or assignee (whether direct or indirect, by purchase, merger, consolidation, or otherwise) to alter substantially all of the business and/or assets of the Company in connection with any Change in Control, to assume and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform any such agreement if no such succession or assignment had taken place; or
>
> (5)    any purported termination of Executive's employment that is not effected pursuant to a notice of termination satisfying the requirements of the Agreement.

*Ibid.*

27.    In March 2007, Kvinlaug signed an Addendum to the TPA that was customized to her situation. Joint Exh. 2; Doc. 192 at p. 2, ¶ 14. The Addendum provided that an additional Good Reason under the TPA would be "the failure by [Claire's] (or any successor thereto)

following a Change in Control to provide you with a written offer at least [one month] prior to the end of the Term under the TPA for continued employment with [Claire's] upon your return to the United States from France on employment terms that are substantially similar to the terms of your employment that were in effect immediately prior to your current assignment in France." Joint Exh. 2 (second alteration in original); Tr. 115:18–116:7 (Kvinlaug).

28.    Kvinlaug did not attempt to change any of the terms presented to her in the Addendum. Tr. 115:18–119:7 (Kvinlaug).

## D.    The "Change in Control" and Management Changes

29.    A Change in Control occurred on May 29, 2007, when Apollo Management VI, L.P., acquired Claire's. Tr. 119:8-24 (Kvinlaug); Doc. 192 at p. 2, ¶ 15. This meant that Kvinlaug's TPA was effective until May 28, 2009. Doc. 192 at p. 2, ¶ 16.

30.    Because Kvinlaug continued to work for Claire's following the Change in Control, she received a one-time retention bonus of $225,000 in accordance with § 3(d) of the TPA. Tr. 236:4-6 (Kvinlaug); Doc. 192 at p. 3, ¶ 19.

31.    Pursuant to the Addendum, Claire's had until April 28, 2009 to give Kvinlaug a written offer for a position in the United States "substantially similar" to the TVP position she held before moving to France. Doc. 192 at p. 2, ¶ 16.

32.    On May 29, 2007, Mark Smith joined Claire's as President and Managing Director of Europe; Smith reported directly to the company's new Chief Executive Officer, Gene Kahn. Tr. 471:24–472:27 (Smith); Doc. 192 at p. 2, ¶ 17.

33.    Ingrid Osmundsen was hired to replace LaFosse, who had returned to the United States, and Osmundsen became Kvinlaug's direct supervisor. Osmundsen's title was Chief

Operating Officer of Europe; she reported to Smith and was based in Zurich. Osmundsen began overseeing the operations in Switzerland, Austria, and Germany, and served as interim Managing Director of those three countries. Doc. 192 at p. 3, ¶ 18; Tr. 68:2–69:22 (Kvinlaug); Tr. 422:17–423:11 (LaFosse); Tr. 472:21–473:4, 495:8-10, 496:12-13, 505:17–506:6 (Smith).

**E.     The March 13, 2008 "European Strategy for Growth" Meeting**

34.     On March 13, 2008, Claire's held a presentation to announce its "European Strategy for Growth," a five-year strategy to improve its growth and performance in Europe. Kvinlaug attended the presentation from Paris via videoconference. The strategy had been in the planning and implementation stages since shortly after the Change in Control. Joint Exh. 6; Tr. 126:21–134:24 (Kvinlaug); Tr. 557:22–558:5, 565:8-20 (Smith); Doc. 192 at p. 3, ¶ 20.

35.     Claire's announced that its European operations would have three Regions, each headed by a Managing Director who would report to Paul Mildenstein, who had replaced Osmundsen as Chief Operating Officer of Europe. Joint Exh. 6 at 3; Tr. 567:11-16 (Smith). Region 1 included the United Kingdom and Ireland; Region 2 included France, Spain, Portugal, and later Belgium; and Region 3 included Switzerland, Austria, and Germany. Joint Exh. 6 at 13.

36.     Michael Baur was identified as the Managing Director of Region 3, the position he had held since being hired in January 2008. The Managing Director positions for Regions 1 and 2 were vacant as of March 2008. Tr. 553:5-8, 567:4–568:2 (Smith).

37.     Kvinlaug and the EGVP position were not identified during the presentation, and neither appeared on the organizational chart. Kvinlaug testified that she was shocked and deeply affected by this. Tr. 126:21–134:24 (Kvinlaug).

38.     When Kvinlaug had dinner with Osmundsen a couple of weeks after the March 13, 2008 presentation, she did not raise the presentation. Tr. 214:18–216:2 (Kvinlaug).

39.     Kvinlaug testified that she had a series of conversations with DeFalco after the presentation. She testified that DeFalco told her in a March 2008 phone call that she was not part of the "go forward organization" in Europe and that she would likely be returned to the United States by July or August. Tr. 141:12–143:13 (Kvinlaug).

40.     Kvinlaug further testified that DeFalco suggested to her in an August 2008 call that she should try to "see some sights in Europe." Tr. 146:5–147:8 (Kvinlaug).

41.     Kvinlaug testified that in a November 2008 call with DeFalco, she raised concerns about her status and alerted DeFalco to the fact that she had not received a performance review. Tr. 148:25–149:13 (Kvinlaug). Kvinlaug testified that LaFosse had given her an oral performance review in 2007 for the year 2006. Tr. 194:12–195:12 (Kvinlaug). Kvinlaug testified that she did not know who gave her a performance review in 2008 for the year 2007. Tr. 195:13-15 (Kvinlaug).

42.     DeFalco testified that Kvinlaug never asserted in their conversations that her job duties had changed as of March 13, 2008. Tr. 822:5-9, 823:14-17, 873:10–874:17 (DeFalco). DeFalco denies saying anything about Kvinlaug not being part of the "go forward organization," though he did acknowledge an offhand comment about her seeing sights in Europe. Tr. 882:23–884:23 (DeFalco). DeFalco testified that he would have remembered if Kvinlaug had asserted that her job duties had changed as of March 13, 2008. Tr. 925:2-11 (DeFalco).

43.     The court does not credit Kvinlaug's testimony that she was shocked and deeply affected by the March 13, 2008 presentation. No evidence corroborates that testimony. The

absence of such evidence is notable, given that (as noted below) Kvinlaug made a point of creating a paper trail when it served her interests. Also, because Kvinlaug was nearly two years into a temporary assignment in Europe that was to last no longer than three years, she cannot plausibly claim to have been "shocked" that she was not mentioned in a presentation regarding the company's five-year strategy in Europe.

44.     Based upon Kvinlaug's and DeFalco's demeanor at trial and the documentary record, the court finds DeFalco's version of events—in which Kvinlaug did not air concerns to him about her role and responsibilities in the wake of the March 13, 2008 presentation—to be more credible than Kvinlaug's.

**F.     Kvinlaug's Job Responsibilities in Europe**

**1.     Switzerland, Austria, and Germany ("SAG"), Spain, and Portugal**

45.     Kvinlaug testified that her role after the March 13, 2008 presentation was to supervise the RSMs in France. Tr. 143:14-21 (Kvinlaug). She testified that she had no further interaction with the store operations personnel, did not approve any of the visual presentations for continental Europe, did not give authorization for marketing materials, and was not involved in pricing strategies. Tr. 216:3–217:1 (Kvinlaug).

46.     Smith testified that Kvinlaug's duties for Switzerland, Austria, and Germany ("SAG") were diminished well before March 13, 2008—in particular, as discussed below, when Smith told in August 2007 Kvinlaug to focus on France and to support Spanish operations, and when Baur became managing director of SAG in January 2008. Tr. 505:17–513:25, 571:10–573:21, 574:1–576:10, 664:21–665:5 (Smith). DeFalco testified that no changes were made to the terms or conditions of Kvinlaug's employment on March 13, 2008, and that he

would have been aware of significant changes to Kvinlaug's responsibilities in light of his role in preparing for the centralization of European operations. Tr. 819:4–821:4 (DeFalco).

47.     After the Change in Control, Smith traveled around Europe to meet with the various members of Claire's management teams. From August 20-22, 2007, Smith, Osmundsen, Kvinlaug, and Jerome Florin met in Madrid, Spain; Florin was the Country Manager of Spain and Portugal. Tr. 505:17–513:25, 571:10–573:21 (Smith).

48.     Florin began reporting to Osmundsen by Summer 2007. Tr. 572:6–573:21 (Smith). Smith testified that he instructed Kvinlaug during the Madrid meetings to focus her attention on France and on assisting Florin with improving field operations in Spain and Portugal. Tr. 513:20-25, 571:10–573:21 (Smith).

49.     Kvinlaug denies that Smith instructed her at or around the August 2007 meeting to focus her attention on France and on assisting Florin. Tr. 86:14-24 (Kvinlaug). Kvinlaug testified that she instead was instructed to become more active in improving the performance of the company's stores in Spain and to devise an action plan to improve their performance. Tr. 120:24–123:20, 1008:2–1010:6 (Kvinlaug).

50.     In September and October 2007, Smith began recruiting candidates to fill the Managing Director role for France, Spain, and Portugal. Kvinlaug was aware of this. In Fall 2007, Smith began recruiting Baur to join Claire's as Managing Director of SAG. Tr. 552:12–553:14, 534:2–538:16 (Smith).

51.     Kvinlaug was not involved in the recruitment or eventual hire of Baur. As Managing Director, Baur was responsible for managing all facets of the company's operations in SAG. Tr. 575:23-25, 536:25–538:1 (Smith).

52. Baur's employment commenced on January 25, 2008. Days later, Smith, Nicki Crossland (Senior Vice President of Human Resources, Europe), and Marie Pierre-Gaulard (Human Resources Director of France) visited the Zurich office to announce Baur's appointment, and then telephoned the District Managers across SAG to make the same announcement. Def. Exh. 15; Tr. 553:5–554:19 (Smith).

53. Baur immediately began exercising full control over SAG operations and was given signatory authority in those countries. He began leading conference calls on which Kvinlaug participated. Tr. 555:13–556:6, 573:22–575:22 (Smith).

54. Baur's salary was €125,000 for a six-month period. Def. Exh. 15. Taking judicial notice of the exchange rate between dollars and euros in January 2008, when one euro was worth about $1.47, Baur's annual salary would have been about $367,500. This indicates that Baur's position in the Claire's European organization was at a higher level than Kvinlaug's.

55. In January 2008, Kvinlaug went to Germany to scout retail locations for new stores; the effort was called the "Liberty Project." Pl. Exh. 113; Tr. 106:6-9, 175:11-20, 244:18–245:10 (Kvinlaug); Tr. 504:2-16, 540:2–542:6 (Smith). Also in January 2008, Kvinlaug worked to address an issue in Germany involving seven stores that were unable to take credit cards. Pl. Exhs. 104-106; Tr. 174:14–175:10, 1010:21–1012:3 (Kvinlaug). And in January 2008, Kvinlaug gave some guidance for store operations to a District Manager in Germany. Pl. Exh. 121; Tr. 175:21–176:6, 1013:4–1016:18 (Kvinlaug).

56. Kvinlaug introduced certain documents in an effort to show that she had a continuing role in SAG after August 2007: (1) an August 22, 2007 email outlining "initiatives" for various countries, including France, Spain, and SAG, Joint Exh. 7; (2) a November 26, 2007

conference call recap, Pl. Exh. 44; (3) a December 3, 2007 conference call recap, Pl. Exh. 43; (4) a December 10, 2007 conference call recap, Pl. Exh. 41; (5) a December 11, 2007 conference call recap, Pl. Exh. 42; (6) a January 29, 2008 conference call summary, Pl. Exh. 37; and (7) a February 19, 2008 conference call summary attaching spreadsheets that referenced SAG, France, Portugal, and Spain, Pl. Exh. 33.

57.     Those documents have little probative value. Most of the documents relate to events that occurred before January 2008. Moreover, that Kvinlaug maintained notes for meetings in which the SAG countries were discussed does not show that she had a meaningful managerial role in those countries after Baur's arrival in January 2008.

58.     In August 2008, Kvinlaug took over responsibility for Belgium, which had about 20 or 25 stores. Tr. 243:23–244:17 (Kvinlaug); Tr. 569:16–570:8 (Smith).

59.     Kvinlaug testified that her travel frequency changed after the March 13, 2008 presentation. Tr. 126:4-7 (Kvinlaug). She admitted that travel was not an important component of the EGVP position and that it was significantly less important to the EGVP position than it had been to her TVP position in the United States. Tr. 96:17-23, 242:20–245:10 (Kvinlaug).

60.     Kvinlaug traveled to Spain and Portugal a few times in 2006, roughly sixteen times in 2007, and twice in 2008—once in early January and once in late March. Pl. Exh. 14; Tr. 100:8–102:2 (Kvinlaug). Kvinlaug traveled to SAG around four times in 2006, roughly ten times in 2007, and twice in 2008—from January 16-17 and from January 22-24. Both of the 2008 SAG trips were to Germany. Kvinlaug last traveled to Switzerland in August 2007 and last traveled to Austria in May 2007. Pl. Exh. 15; Tr. 102:3–104:2 (Kvinlaug). Kvinlaug traveled to Belgium in June 2008 and in 2009. Tr. 244:6-17 (Kvinlaug).

61.     After considering all of the evidence presented on the question, including the demeanor of the witnesses, the court finds that Smith's testimony regarding the discussions at the August 2007 meetings in Madrid is more accurate than Kvinlaug's testimony; thus, the court finds that Smith instructed Kvinlaug at that time to focus her attention on France and on assisting Florin with improving field operations in Spain and Portugal. To the extent Florin ever reported to Kvinlaug, he stopped doing so in Summer 2007 when he began to report to Osmundsen. The court also finds as a factual matter that any diminishment in Kvinlaug's responsibility for Spain and Portugal was effectively counterbalanced by the responsibility she was given for Belgium.

62.     After considering the relevant evidence, the court finds as a factual matter that Kvinlaug's responsibility for SAG prior to Baur's arrival consisted primarily of discrete projects not indicative of a top-level executive exercising managerial responsibility over those countries. The court also finds as a factual matter that Kvinlaug's responsibility for SAG had become negligible by January 2008, when Baur joined Claire's, and that Kvinlaug was aware of this fact.

### 2.     Organizational Charts

63.     A Claire's update for the first and second quarters fiscal year 2007 announced Kvinlaug's EGVP position: "Global Senior VP has been added to our European family." The document noted that Kvinlaug would be based in Paris and would "be overseeing Francois [Cournil] and Jerome [Florin] in their assigned countries in all aspects of operations." Pl. Exh. 13. Cournil was the Vice President of Operations and Field for France and SAG. Tr. 55:10-11 (Kvinlaug). As noted above, Florin was responsible for Spain and Portugal.

-14-

64.     Organizational charts dated July 20, 2007 identified Kvinlaug as "Group Vice President Field Operations S[AG], Spain, Portugal, France." The charts identified Cournil as reporting to Kvinlaug. Pl. Exh. 56.

65.     Organizational charts dated September 1, 2007 identified Kvinlaug as "Group Vice President, Field Operations France, SAG, Spain & Portugal." The charts identified Cournil as reporting to Kvinlaug. Pl. Exh. 57.

66.     A December 2007 PowerPoint presentation titled "Pan-European Transformation Project" identified Kvinlaug as "Group EVP, Managing Director France/SPAGS [Spain, Portugal, Austria, Germany, Switzerland]." The Retail Operations Directors of France and Spain/Portugal are identified as reporting to Kvinlaug. Joint Exh. 3. Florin held the Spain/Portugal position at that time. Tr. 79:25–80:7 (Kvinlaug).

67.     Other undated organizational charts identified Kvinlaug as EGVP for SAG, Spain, Portugal, and France. One chart listed her as responsible for "field operations, visual merchandising, and head office operations." A second chart listed her as responsible for "field and store operations," with direct reports Cournil and Benoit Robet, who at the time was Manager of Loss Prevention in France. A third chart listed Kvinlaug as responsible for "field and store operations" and with Florin as a direct report. A fourth chart identified Cournil as a direct report to Kvinlaug. Pl. Exh. 18. These charts were given to Kvinlaug by Claire's Vice President of Human Resources for continental Europe during two meetings, one while LaFosse supervised her and another while Osmundsen did so. Tr. 58:5–62:6 (Kvinlaug).

68.     Kvinlaug admitted that her official title was never "Executive Group Vice President, field and store operations," "group vice president, field operations," or "group EVP,

managing director." Tr. 252:2-12, 254:15-20, 256:12-21 (Kvinlaug). Kvinlaug also admitted to inaccuracies in these charts; for example, DeFalco is incorrectly shown as reporting to LaFosse. Tr. 252:24–253:7 (Kvinlaug).

69.　　Smith disputed the accuracy of the charts, noting that Kvinlaug's titles were inaccurate and inconsistent. Pl. Exhs. 56-57; Tr. 665:16–669:10 (Smith).

70.　　The court finds as a factual matter that these organizational charts are entitled to little weight in determining Kvinlaug's responsibilities as EGVP. Although the charts were produced by Claire's, it is unclear who created the charts and for what purpose. The charts' inaccuracies and inconsistencies further diminish their probative value.

### 3.　　Kvinlaug's Responsibility for France

71.　　In mid-2007, Claire's had approximately 210 stores in France and 80 to 90 stores in SAG. Tr. 500:11-21 (Smith).

72.　　Kvinlaug's bonus as EGVP was determined in part by total company performance and in part by "line of sight," which reflects the performance of the areas for which the employee is most responsible. The "line of sight" metrics for Kvinlaug's bonus as EGVP related entirely to the company's performance in France, and were not tied to the performance of any other country in Europe. Tr. 772:14–773:9 (DeFalco).

73.　　Kvinlaug had signatory authority only in France. Tr. 207:20–208:17 (Kvinlaug).

74.　　After considering the relevant evidence, the court finds as a factual matter that France comprised Kvinlaug's primary and most substantial responsibility from the outset of her tenure as EGVP. This conclusion is consistent with her residing in Paris and the fact that France comprised the most substantial component of the company's market in continental Europe.

## 4. Direct/Indirect Reports and Conference Calls

75. Kvinlaug testified that her direct and indirect reports decreased after the March 13, 2008 presentation, and that she stopped supervising Florin at that point. Tr. 144:7–145:11, 221:8–226:7 (Kvinlaug). The court finds as a factual matter that Kvinlaug no longer supervised Florin as of Summer 2007, months before the March 13, 2008 presentation. Tr. 572:6–573:21 (Smith).

76. Kvinlaug also claims that her role in conference calls diminished after the March 13, 2008 presentation. Monthly performance plan review ("MPPR") calls were conducted once a month for France and once a month for SPAGS. Kvinlaug testified that she was the point person for those calls prior to March 13, 2008. Tr. 80:13–81:9 (Kvinlaug).

77. Matt Kilroy, who participated on those calls from the United States, described Kvinlaug as the liaison to Europe. Tr. 985:4–987:16 (Kilroy). After March 13, 2008, the MPPR calls were consolidated into a single monthly call, though the change was phased in and did not occur until June 2008. Tr. 185:23–189:21 (Kvinlaug).

78. Prior to the March 13, 2008 presentation, weekly conference calls were conducted on Monday at 9:00 a.m. with the store operations teams from the Zurich office, the French office, and the Spanish office. Pl. Exh. 41; Tr. 88:1–89:2, 177:23–178:1, 178:12–182:2 (Kvinlaug); Tr. 394:1–395:1 (LaFosse). Other weekly conference calls were conducted on Monday at 1:00 p.m. with store operations personnel from Zurich, France, and Spain, as well as RSMs and other store operations and support personnel. Tr. 178:2-7, 182:3–184:20 (Kvinlaug); Tr. 395:2–396:5 (LaFosse). Still other weekly conference calls were conducted on Monday at 5:00 p.m. with merchants from the United States and the field operations team in continental

Europe; these calls would review sales from the previous week. Pl. Exhs. 33, 37, 42; Tr. 82:19–86:24, 178:8-11, 184:21–185:22, 190:2–193:2 (Kvinlaug); Tr. 396:6–397:2 (LaFosse).

79.     Kvinlaug testified that the only conference calls she conducted on Mondays after March 13, 2008 were the RSM calls, and that her role was only to give information and not to set direction. Tr. 143:22–144:6 (Kvinlaug). Kvinlaug admitted that at no point did her supervisor tell her to stop conducting conference calls. Tr. 192:5–193:2 (Kvinlaug).

80.     After considering the relevant evidence, the court finds as a factual matter that while the number of Kvinlaug's direct and indirect reports may have decreased after March 13, 2008, the decrease was minor and did not materially affect her actual duties and responsibilities. Similarly, while the number of conference calls may have decreased and Kvinlaug's role on the ongoing calls was more passive than active, the change was marginal and did not materially affect Kvinlaug's role as EGVP.

**G.     The Company's Offer of the Southwest TVP Position**

81.     During Kvinlaug's tenure as EGVP, the regions overseen by each TVP were realigned and the number of TVPs was reduced from five to four.

82.     On January 27, 2009, DeFalco called Kvinlaug and stated that Claire's was prepared to return her to the United States as a TVP. Kvinlaug was offered the Southwest Region, which included California, Hawaii, Oregon, Arizona, New Mexico, Nevada, Texas, Oklahoma, Arkansas, Kansas, Mississippi, and Louisiana. Tr. 151:9–152:23, 945:24–946:3 (Kvinlaug); Tr. 345:9-23 (Collins).

83.     In a January 28, 2009 email, Kvinlaug asked DeFalco to put the offer in writing. Kvinlaug's email suggested her view that the Southwest TVP position would require her to relocate from Atlanta to Dallas. Pl. Exh. 61; Tr. 152:21-23 (Kvinlaug).

84.     In a January 29, 2009 email, DeFalco summarized the TVP offer and wrote that Kvinlaug could "choose [her] legal residence to be in Atlanta." Joint Exh. 9; Tr. 156:11–157:12 (Kvinlaug). DeFalco added: "One point of clarification relative to your e-mail, is that we are changing your place of employment from Europe, not Atlanta, to the U.S., not to Dallas specifically." Joint Exh. 9.

85.     DeFalco testified that Claire's did not require Kvinlaug to move to Dallas in order to accept the Southwest TVP position. Tr. 789:24–790:16, 792:12-21 (DeFalco). Colleen Collins, who would have supervised Kvinlaug had she accepted the position, testified that Kvinlaug would have been permitted to live in Atlanta. Tr. 946:11-22 (Collins).

86.     DeFalco and Collins testified that while TVPs generally were in their assigned regions from Tuesday at 10:00 a.m. through Friday at around 5:00 p.m., those were guidelines and not rigid requirements. Tr. 792:16–793:5 (DeFalco); Tr. 933:23–935:17 (Collins).

87.     Collins further testified that the Southwest TVP position would not have required a weekly presence in California or Hawaii, and that the TVP responsible for Hawaii typically travels there only twice per year. Tr. 936:21–938:19 (Collins). Collins added that the Northwest TVP position required travel from the West Coast of the United States to the East Coast of Canada. Tr. 936:2-7 (Collins).

88.     While working as a TVP before leaving for France, Kvinlaug's territories included several States in what later became the Southwest Region, including Texas, Oklahoma,

Arkansas, Kansas, Mississippi, and Louisiana. Tr. 344:19–345:23 (Kvinlaug); Tr. 945:22–946:10 (Collins).

89.     Had Kvinlaug accepted the Southwest TVP position, she would have performed the same duties that she had performed as a TVP before leaving for France. Kvinlaug was offered an annual salary of $180,000 as Southwest TVP, as compared to the $165,000 salary she had earned as a TVP prior to her EGVP assignment. Tr. 264:3-6 (Kvinlaug).

90.     After considering the relevant evidence, the court finds as a factual matter that the Southwest TVP position offered to Kvinlaug was materially the same as her prior TVP position. Travel comprises a large part of the TVP role, and while some of Kvinlaug's flights would have been longer in the Southwest TVP role, the difference was not significant in itself or to the nature of the TVP position.

## H.     Kvinlaug's Internal Claims for TPA Benefits

91.     In April 2008, Kvinlaug asked LaFosse to recommend an attorney. Tr. 438:9-11 (LaFosse). Shortly thereafter, Kvinlaug first spoke with William Provenzano, an attorney whom LaFosse had recommended; Provenzano filed Kvinlaug's complaint in this case and represented her for much of the litigation. Provenzano is the same attorney who had represented LaFosse in negotiations over her exit package with Claire's. Tr. 236:14–239:23 (Kvinlaug).

92.     Kvinlaug made her first request for TPA benefits on February 2, 2009. During a meeting with DeFalco in Chicago, Kvinlaug asserted that the company's offer to return her to the United States as a TVP was a materially adverse change to the nature of her employment, giving her Good Reason to resign. Tr. 160:2–162:7 (Kvinlaug). That same day, Kvinlaug gave DeFalco a letter, which began: "As a result of the changes being made by Claire's to my

employment as confirmed by your e-mails and by our several telephone conversations, by the terms of the [TPA], Claire's has established 'Good Reason' for me to terminate my employment with Claire's." Pl. Exh. 64; Def. Exh. 18.

93.     The letter then stated: "Claire's has told me that they are changing my principal place of employment from France to the United States," and therefore that "Good Reason is established" under § X(3) of Schedule A of the TPA, which applies where the company relocates a covered employee's "principal place of employment" by more than 35 miles from her current location. *Ibid.* (internal quotation marks omitted).

94.     The letter then stated that Good Reason was established under § X(1)—which applies where the company makes an adverse alteration in an employee's title or nature or status of her responsibilities—by changing her title from EGVP to TVP and by lowering her salary from $250,000 or $300,000 to $180,000. *Ibid.*

95.     The letter then stated that Good Reason was established under § X(2), which applies where an employee's base salary and/or target bonus are reduced, by reducing her base salary and target bonus. *Ibid.*

96.     At trial, Kvinlaug admitted that the Addendum required Claire's to offer her a TVP position in the United States. Tr. 280:11-14 (Kvinlaug).

97.     DeFalco testified, contrary to what Kvinlaug claimed in her February 2 letter, that he never "confirmed" that Good Reason had been established or that any changes were being made to Kvinlaug's employment. Tr. 801:15–802:10 (DeFalco). After considering the relevant evidence and the witnesses' demeanor, the court finds as a factual matter that DeFalco's version of his discussions with Kvinlaug is more credible.

98.    At the February 2 meeting and in her February 2 letter, Kvinlaug did not maintain

that she had suffered a materially adverse alteration in her responsibilities or conditions of

employment as a result of the changes announced at the March 13, 2008 presentation.

99.    Kvinlaug made her second request for TPA benefits in a February 5, 2009 email

to DeFalco. The email says in relevant part: "This will confirm our meeting of February 2, 2009

during which we confirmed my separation from employment with Claire's for 'Good Reason' as

defined by the [TPA] due to Claire's elimination of my current position. Please provide me the

precise effective date of my return to the USA due to the elimination of my position in Europe.

This, as you know, will effectuate the commencement of my severance benefits per the TPA."

Pl. Exh. 63; Def. Exh. 22. By "current position," Kvinlaug meant her EGVP position in Europe.

Tr. 164:8-15, 176:17–177:12 (Kvinlaug). Kvinlaug had not advanced that particular Good

Reason theory in her February 2 letter.

100.    DeFalco testified that he did not "confirm" at the February 2 meeting Kvinlaug's

separation from Claire's; he characterized Kvinlaug's February 5 email as "a complete

fabrication." Tr. 807:20–809:17 (DeFalco). After considering the relevant evidence, including

the witnesses' demeanor, the court credits DeFalco's version of the February 2 meeting.

101.    Kvinlaug made her third request for TPA benefits in a February 13, 2009 email to

DeFalco. The email says: "As a follow-up from my email and our meeting in Chicago, we

confirmed my separation from employment with Claire's for 'Good Reason' as defined by the

[TPA] due to Claire's elimination of my current position." Joint Exh. 10.

102.    The court finds as a factual matter that, contrary to what the February 13 email

says, DeFalco did not earlier confirm Kvinlaug's separation from Claire's and did not confirm

that Good Reason existed for Kvinlaug to resign. Tr. 810:1–811:1 (DeFalco). Kvinlaug's repeated attempts to mischaracterize her communications with DeFalco in order to advance her claim for TPA benefits severely undermines her credibility, not just with respect to her communications with DeFalco, but as a general matter.

103.    Kvinlaug testified that she sent written communications to DeFalco and Rebecca Orand, General Counsel of Claire's, on February 16 and 17, 2009. Pl. Exhs. 66-67; Def Exhs. 23, 28; Tr. 1046:20–1051:13 (Kvinlaug). Those communications set forth Kvinlaug's fourth request for TPA benefits.

104.    There are two letters among the February 16-17 communications; they are virtually identical except in one crucial respect. One letter invokes the March 13, 2008 presentation as a Good Reason to resign. Pl. Exh. 67; Tr. 166:24–167:13 (Kvinlaug). This was the first time that Kvinlaug referenced the March 13, 2008 presentation as a Good Reason. Tr. 293:4–294:14 (Kvinlaug); Tr. 814:6-8 (DeFalco). The other letter does not reference the March 13, 2008 presentation. Def. Exh. 23.

105.    The letter that did not invoke the March 13, 2008 presentation was attached to a February 16, 2009, 6:21 p.m. email from Kvinlaug to DeFalco; the attachment is labeled "DK.doc." Def. Exh. 23. The other letter, which Kvinlaug introduced into evidence, does not indicate on its face that it had been attached to an email. Pl. Exh. 67.

106.    The record also includes a February 16, 2009, 7:16 p.m. email from Kvinlaug to Orand; as introduced into evidence, the email does not have an attachment, but the email itself indicates that there was an attachment labeled "DK.doc." Def. Exh. 28. Orand testified that the attachment to that email was the same letter that had been attached to Kvinlaug's email to

-23-

DeFalco—the letter that did not invoke the March 13, 2008 presentation as a Good Reason. Tr. 1066:11–1067:1 (Orand). After Kvinlaug's counsel suggested to her on direct examination that she might have modified the letter sent to DeFalco to add a reference to the March 13, 2008 presentation, saved it under the same file name ("DK.doc"), and then emailed it to Orand less than an hour after emailing DeFalco, Kvinlaug testified that this is what had happened. Tr. 1050:1-3, 1051:20-25 (Kvinlaug).

107. The court finds that Orand's recollection of what was attached to the February 16, 2009 email that Kvinlaug sent to her is more accurate than Kvinlaug's recollection. This is based on the two witnesses' demeanor while testifying and Kvinlaug's repeated attempts to mischaracterize her communications with Claire's in an attempt to recover TPA benefits. It also is based on Kvinlaug's willingness while testifying to adopt her counsel's strained explanation for the supposed discrepancy between the "DK.doc" attachment sent to DeFalco and the one sent less than an hour later to Orand. The court does not believe that Kvinlaug would have sent two different versions of the letter to DeFalco and Orand in that brief period of time; if she had done that, she certainly would have sent DeFalco the version of the letter that referenced the March 13, 2008 presentation as a Good Reason, as Kvinlaug's practice was to paper everything that she was doing in an effort to obtain TPA benefits. Orand at some point did receive the version of the letter that cited the March 13, 2008 presentation as a Good Reason. Tr. 1070:19–1071:8 (Orand).

108. On February 20, 2009, Orand sent Kvinlaug a letter disputing that her position had been "eliminated," and pointing out that after Kvinlaug had rejected the Southwest TVP offer during her visit to the United States, "Claire's paid for your return flight to France so you

-24-

could continue to perform your job responsibilities in France. We understand you are continuing to perform [these] responsibilities in France. Obviously, Claire's would not have sent you back to France to perform duties for an eliminated position." Joint Exh. 11.

109. On or about March 6, 2009, Kvinlaug sent Mildenstein a letter claiming that on January 30, 2009, Mildenstein told her that Claire's had no need for her position in France and that she would not be included in the organization for Europe going forward. Pl. Exh. 71; Tr. 173:8–174:10 (Kvinlaug). The letter further claimed that Kvinlaug had not been performing the functions of EGVP since March 13, 2008. Pl. Exh. 71.

110. The claims made in that letter cannot be reconciled with the fact that Kvinlaug had been working in France for nearly a year after the March 13, 2008 presentation, during which time she collected her compensation and benefits and did not inform any member of management that she was no longer performing her EGVP functions. The court accords little weight to this letter given Kvinlaug's repeated willingness to mischaracterize conversations she had with Claire's in her attempts to collect TPA benefits.

111. On March 9, 2009, Kvinlaug announced her immediate resignation from Claire's. Her resignation letter, which was sent to Orand, cited § X of Schedule A of the TPA, saying that "there has been a materially adverse alteration in my title, and the nature and status of my responsibilities and conditions of employment from those in effect immediately prior to the Change in Control." Joint Exh. 12; Tr. 172:1-22 (Kvinlaug); Doc. 192 at p. 3, ¶ 21.

112. During her testimony, Kvinlaug admitted that none of her 2009 communications claiming TPA benefits maintained that the Southwest TVP position was not "substantially similar" to the TVP position she had held before leaving for Europe. Tr. 296:14–297:4

(Kvinlaug). DeFalco confirmed that Kvinlaug did not assert in any correspondence to him or Orand that the Southwest TVP position was not substantially similar to her prior TVP position. Tr. 817:6-15 (DeFalco).

113.    Based on Kvinlaug's and DeFalco's testimony, and the fact that no party introduced into evidence any such writing, the court finds that Kvinlaug never asserted in writing to Orand that she had Good Reason to resign because the Southwest TVP position offered to her was not "substantially similar" to the TVP position she had held before leaving for Europe.

114.    Despite her resignation on March 9, 2009, due to French law, Kvinlaug did not officially separate from Claire's until June 10, 2009. Tr. 816:23–817:5, 920:9-16 (DeFalco); Doc. 192 at p. 3, ¶ 22.

115.    Kvinlaug filed this suit on June 9, 2009, one day before her official separation from Claire's. Doc. 192 at p. 3, ¶ 23.

### Conclusions of Law

As noted above, Kvinlaug's claims are governed by ERISA. The TPA—a term that, unless otherwise noted, is used to connote the TPA and the Addendum—does not expressly grant Claire's discretionary authority to determine whether a claimant is entitled to TPA benefits. It follows that the court must independently review, without affording any deference to the company's decision, whether Claire's violated ERISA by denying Kvinlaug's request for TPA benefits. *See Conkright v. Frommert*, 559 U.S. 506, 130 S. Ct. 1640, 1646 (2010) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)); *Aschermann v. Aetna Life Ins. Co.*, 689 F.3d 726, 728 (7th Cir. 2012); *Comrie v. IPSCO, Inc.*, 636 F.3d 839, 842 (7th Cir. 2011). In conducting an independent review, the court considers the record developed in this

litigation. *See Krolnik v. Prudential Ins. Co. of Am.*, 570 F.3d 841, 843 (7th Cir. 2009); *Casey v. Uddeholm Corp.*, 32 F.3d 1094, 1099 n.4 (7th Cir. 1994).

The TPA's terms must be interpreted in "an ordinary and popular sense, as [they] would [be understood by] a person of average intelligence and experience." *Sellers v. Zurich Am. Ins. Co.*, 627 F.3d 627, 632 (7th Cir. 2010) (internal quotation marks omitted) (alterations in original). "As a general rule, an unambiguous contract should be construed without reference to extrinsic evidence. If the language of the contract provides an answer, then the inquiry is over; parol evidence is neither necessary nor admissible." *Bowles v. Quantum Chem. Co.*, 266 F.3d 622, 635 (7th Cir. 2001) (citations and internal quotation marks omitted). "Written contracts are presumptively complete in and of themselves; when merger clauses are present, this presumption is even stronger." *Bock v. Computer Assocs. Int'l, Inc.*, 257 F.3d 700, 707 (7th Cir. 2001). The TPA includes an integration clause, Joint Exh. 1 ¶ 13, and the TPA's terms are unambiguous. Accordingly, parol evidence will not be considered in interpreting the TPA.

As described in Section H of the Findings of Fact, Kvinlaug's internal communications asserting her entitlement to TPA benefits invoked an array of grounds for why she had Good Reason to resign. In this litigation, Kvinlaug has settled on four grounds: (1) the alleged diminishment of her responsibilities as EGVP effected a "materially adverse alteration ... in the nature or status of [her] responsibilities or conditions of employment from those in effect immediately prior to [the] Change in Control" within the meaning of § X(1); (2) the terms of the Southwest TVP position offered to Kvinlaug were not "substantially similar" to the terms of her prior TVP position within the meaning of the Addendum; (3) the salary that Claire's offered to Kvinlaug for the Southwest TVP position was less than the salary Kvinlaug earned as EGVP,

constituting a "reduction in Executive's Base Salary" under § X(2); and (4) to assume the Southwest TVP position, Kvinlaug would have had to move from France to the United States, constituting a "relocation of Executive's principal place of employment to a location more than 35 miles" under § X(3). Doc. 192 at pp. 90-108 (Kvinlaug's proposed conclusions of law); Doc. 196-2 (Kvinlaug's supplemental proposed conclusions of law).

**1.    Section X(1): Materially Adverse Alteration**

Section X(1) defines "Good Reason" as "any materially adverse alteration in the Executive's title or in the nature or status of Executive's responsibilities or conditions of employment from those in effect immediately prior to [the] Change in Control." Joint Exh. 1, Sched. A, § X(1). Kvinlaug's salary and benefits were increased, not diminished, during her tenure as EGVP. She argues, however, that she suffered a materially adverse alteration in her responsibilities as EGVP as a result of the March 13, 2008 presentation regarding the company's five-year plan for Europe. Kvinlaug's argument has no merit.

It first is necessary to address a timing issue. The Good Reason provision says: "Executive shall have one year from the time Executive first becomes aware of the existence of Good Reason to resign for Good Reason." *Id.*, Sched. A, § X. Kvinlaug resigned on March 9, 2009. Thus, the only alterations in her job responsibilities that Kvinlaug may invoke to establish Good Reason under § X(1) are those of which she first became aware after March 9, 2008. This is why Kvinlaug has no choice but to focus her attention on the March 13, 2008 presentation and to argue that her responsibilities were materially diminished as a result of and/or at the time of the presentation. The trouble with Kvinlaug's submission is that any adverse alteration in Kvinlaug's EGVP responsibilities occurred, if at all, well before March 2008.

This is certainly the case with respect to Kvinlaug's responsibilities for SAG. From the outset of her EGVP assignment, Kvinlaug's principal responsibility was France—she was based in Paris; France represented the lion's share of the company's continental European market; and her bonus as EGVP was largely based on the company's performance in France. Kvinlaug's responsibilities for SAG, by contrast, were limited, consisting primarily of discrete projects, such as the Liberty Project, undertaken in response to specific issues arising in those countries.

By mid-2007, Osmundsen had begun overseeing the operations in SAG and had become Managing Director of those three countries. Smith instructed Kvinlaug in August 2007 to focus on France and on helping Florin in Spain and Portugal. In January 2008, Baur took over as Managing Director for SAG and assumed full control of nearly all facets of the business in those countries, including field operations. Kvinlaug's last travel to SAG coincided with Baur's arrival in Zurich and his assumption of the Managing Director position. Even if Kvinlaug had been overseeing field operations in SAG at one point, she would have become aware by January 2008 that she no longer had that responsibility. The evidence thus shows that even if Kvinlaug's responsibilities for SAG were materially diminished during her tenure as EGVP, the diminishment occurred by mid-2007 and absolutely no later than January 2008. Because Kvinlaug was aware of this before March 2008, she cannot rely on the alleged diminishment of her SAG responsibilities in seeking TPA benefits under § X(1).

With respect to Spain and Portugal, Kvinlaug lost whatever supervisory responsibility she had over Florin by Summer 2007 and was relegated in August 2007 to assisting Florin with field operations in those countries. Although she traveled frequently to Spain and Portugal during the last four months of 2007, those travels ceased in January 2008, save a final trip to

Spain in late March. The evidence thus shows that even if Kvinlaug's responsibilities for Spain

and Portugal were materially diminished during her tenure as EGVP, the diminishment occurred

no later than August 2007 and certainly no later than January 2008. Moreover, even if there had

been a non-trivial diminution in her responsibilities for Spain and Portugal on or after March 13,

2008, the change was minor and was effectively offset by Kvinlaug's assumption of

responsibility for Belgium in mid-2008.

The absence of Kvinlaug's name and EGVP title from the March 13, 2008 presentation

did not effect a materially adverse alteration in her title or in the nature or status of her

responsibilities or conditions of employment. The presentation was intended to showcase

Claire's five-year plan for Europe, and as of March 2008, Kvinlaug's temporary assignment in

Europe was to last, at most, for about a year longer. It stands to reason that Kvinlaug's name

and title would not appear in a presentation regarding the company's five-year plan for Europe.

It does appear that Kvinlaug's responsibilities for certain conference calls were

diminished after the March 13, 2008 presentation. But that alteration was not material either in

itself or in the context of the EGVP position. Conference calls did not constitute a major part of

Kvinlaug's EGVP responsibilities. Moreover, the EGVP position was a temporary one designed

to assist with various tasks relevant to expanding the company's presence in continental Europe.

Any diminishment in Kvinlaug's responsibilities for conference calls was not only relatively

minor, but also consistent the nature of the temporary EGVP position.

The analysis of Kvinlaug's § X(1) argument could stop here, but it bears mention that

Kvinlaug's reaction to the March 13, 2008 presentation confirms that no materially adverse

alteration occurred at the presentation or in its wake. As noted above, the court does not credit

Kvinlaug's testimony that she was shocked and dismayed by the presentation, and it does credit DeFalco's testimony that Kvinlaug did not express any concerns to him in the months after the presentation about her role and responsibilities. Moreover, when Kvinlaug began in early February 2009 to argue for TPA benefits, she did not mention the March 13, 2008 presentation in her first three communications, which were made on February 2, February 5, and February 13. The first possible time she mentioned the presentation—and, as discussed in Section H of the Findings of Fact, it is likely that she did not mention it even then—was in her fourth communication on February 16 or 17. Thus, if Kvinlaug is to be believed, even though she was aware of a material diminishment to her responsibilities on March 13, 2008, even though she was shocked and dismayed by this turn of events, and even though she regularly aired her concerns to DeFalco over the following several months, the March 13, 2008 presentation did not come to mind the first three times she asserted in February 2009 that she had Good Reason to resign. That is just not credible. That Kvinlaug herself did not mention the March 13, 2008 presentation in at least her first three efforts to argue for TPA benefits confirms, though confirmation is unnecessary, that the presentation did not signal a materially adverse diminishment of her job responsibilities.

To summarize: During the year prior to her resignation, Kvinlaug's responsibilities for her temporary EGVP position were not altered in a materially adverse way. It follows that Kvinlaug is not entitled to TPA benefits under § X(1).

**II.    Addendum: "Substantially Similar" TVP Position**

Kvinlaug asserts that the Southwest TVP position that Claire's offered her in January 2009 was not "substantially similar" to the TVP position she had held before her temporary

assignment in Europe. This, Kvinlaug asserts, establishes Good Reason under the Addendum, which defines Good Reason as "the failure by the Company … to provide [her] with a written offer at least [one month] prior to the end of the Term under the TPA for continued employment with the Company upon [her] return to the United States from France on employment terms that are substantially similar to the terms of [her] employment that were in effect immediately prior to [her] current assignment in France." Joint Exh. 2 (second alteration in original). The argument fails for two independent reasons.

First, Kvinlaug did not provide Claire's with proper notice of this particular Good Reason claim. The TPA provides in relevant part: "Notice of termination … for Good Reason shall be given in accordance with Section 12, and shall indicate the specific termination provision hereunder relied upon, the relevant facts and circumstances and the Termination Date." Joint Exh. 1 at § 4. Section 12, in turn, provides that "any notice and all other communications provided for in this Agreement shall be in writing and shall be deemed to have been duly given when received at the respective addresses set forth below," and states that notice "to the Company" was to be given to its General Counsel, who at all relevant times was Orand. *Id.* at § 12. Yet Kvinlaug never asserted in writing to Orand (or to DeFalco) that she had Good Reason to resign because the Southwest TVP position was not "substantially similar" to her prior TVP position. Kvinlaug therefore cannot seek Good Reason benefits on that ground.

Second, even putting aside the lack of proper notice, Kvinlaug's "substantially similar" claim fails on the merits. There were only four TVP positions in January 2009, when Claire's offered Kvinlaug the Southwest TVP position, and the Southwest TVP position was "substantially similar" to her prior TVP position. The salary for the Southwest TVP position

($180,000) was higher than her previous TVP salary ($165,000). Kvinlaug asserts that the travel demands of the Southwest TVP position—especially the need to fly from Atlanta to California or Hawaii—were more onerous than the travel demands of the prior position. Doc. 192 at p. 106, ¶ 56(b). Kvinlaug is right that the travel demands were somewhat heavier, but the distinction is not significant enough to make the Southwest TVP position not "substantially similar" to her prior TVP position.

Extensive travel was an integral component of any TVP position. The Northwest territory, for example, extended from the west coast of the United States to the east coast of Canada. Kvinlaug's prior TVP territories included, at one time or another, Alabama, Arkansas, Florida, Georgia, Illinois, Iowa, Kansas, Louisiana, Mississippi, Missouri, North Carolina, Oklahoma, Puerto Rico, South Carolina, Tennessee, Texas, and Wisconsin. The Southwest territory included several of those States—Texas, Oklahoma, Arkansas, Kansas, Mississippi, and Louisiana—as well as California, Hawaii, Oregon, Arizona, New Mexico, and Nevada. Kvinlaug expressed particular consternation about the inclusion of California (!) and Hawaii (!!) in the Southwest territory, but the evidence shows that travel to Hawaii would have been required only twice per year, and that when Kvinlaug traveled to California or Hawaii, she would have been permitted to arrive later than 10:00 a.m. on Tuesday and to depart earlier than 5:00 p.m. on Friday. Accordingly, even though the travel demands of the Southwest TVP position would have been marginally heavier than the travel demands of her prior TVP position, the two positions still were "substantially similar" within the meaning of the Addendum.

### III.    Sections X(2) and X(3): Reduction in Salary and Relocation

Kvinlaug maintains that when Claire's offered her the Southwest TVP position, it

reduced her salary from the $300,000 she earned as EGVP to the $170,000 she would have

earned as Southwest TVP, and it relocated her more than 35 miles, from France to the United

States. This, Kvinlaug asserts, establishes Good Reason under § X(2), which defines Good

Reason as "a reduction in Executive's Base Salary and/or Target Bonus," and under § X(3),

which defines Good Reason as "the relocation of Executive's principal place of employment to a

location more than 35 miles from such location." Joint Exh. 1, Sched. A, §§ X(2), X(3). The

argument fails for two independent reasons.

First, Kvinlaug's submission ignores a key limitation on the Good Reason provision—the

"actions" listed in § X, including salary reductions and relocations more than 35 miles, constitute

Good Reason only if they are taken "without Executive's prior written approval." *Id.*, Sched. A,

§ X. The evidence demonstrates that Kvinlaug consented in writing to her relocation from

Europe to the United States following the conclusion of her temporary EGVP assignment. The

Assignment Letter expressly provided that the location of Kvinlaug's EGVP assignment would

be "Paris, France," that the assignment was "[u]p to three years in duration," that Claire's "will

pay for the cost of upkeep to your home in Georgia," and that Kvinlaug would be "[a]ssigned a

comparable position for Claire's North America upon completion of assignment and return to the

U.S." Joint Exh. 4. Although Kvinlaug did not formally sign the Assignment Letter, it was

"presented" to her at a meeting with LaFosse and DeFalco and she "accepted [it] as presented."

Tr. 46:18-21 (Kvinlaug). Kvinlaug signed the Addendum, which amended the TPA "[i]n light of

*your current assignment in France*" to provide that the term "Good Reason" would include "the

failure by the Company (or any successor thereto) following a Change of Control to provide you with a written offer [by April 28, 2009] for continued employment with the Company *upon your return to the United States from France* on employment terms that are substantially similar to the terms of your employment that were in effect immediately prior to *your current assignment in France.*" Joint Exh. 2 (emphasis added). Kvinlaug also signed a French temporary work visa, Def Exh. 1, which by its temporary nature necessarily reflects her agreement that she would return to the United States, and two federal tax forms expressly stating that she was on a "3 YEAR ASSIGNMENT" in France, Def. Exh. 32 at KVINLAUG-1062; Def. Exh. 34 at KVINLAUG-1143.

The Addendum plainly provides Kvinlaug's express written agreement that she would be "return[ed] to the United States" after her EGVP assignment ended; the French visa and tax returns likewise are written acknowledgments that she would leave France after three years. The Assignment Letter—which Kvinlaug indisputably accepted, and which the Assignment Letter, by referring to Kvinlaug's "current assignment in France," incorporated by reference, *see Senior v. NSTAR Elec. & Gas Co.*, 449 F.3d 206, 219-20 (1st Cir. 2006) (applying incorporation by reference doctrine in an ERISA case)—reinforces the conclusion that Kvinlaug agreed that her European assignment was temporary and that she eventually, within three years of leaving for Europe, would be "[a]ssigned" a position for Claire's North America. It follows that Kvinlaug gave express prior approval to her relocation from France to the United States, and therefore that any such relocation does not provide Good Reason under the TPA. *See Guinta v. Mobil Corp. E'ee Severance Plan*, 205 F. Supp. 2d 715, 722-26 (S.D. Tex. 2002) (holding that the plaintiff did not have "good reason" to resign due to the company's relocating him more than fifty miles

-35-

where the plaintiff gave written consent to the relocation), *aff'd*, 66 F. App'x 524 (5th Cir. 2003).

The same result holds for the salary reduction that would have resulted from the conclusion of Kvinlaug's temporary EGVP assignment and the taking of the Southwest TVP position. The Assignment Letter provided that Kvinlaug's "[b]ase annual salary will be $250,000" as EGVP—much higher than the $165,000 base salary she earned as a TVP before leaving for France—and the Addendum provided that Claire's would offer Kvinlaug a TVP position on terms "substantially similar" to the terms of her prior TVP position. Joint Exhs. 2 & 4. By signing the Addendum, Kvinlaug expressly agreed that Claire's could pay her a TVP-level salary, which she knew was substantially less than her EGVP salary; Claire's made good by offering her a $180,000 salary as Southwest TVP. Because Kvinlaug gave express prior approval to the reduction of her salary, any such reduction does not provide Good Reason under the TPA.

Second, even putting aside Kvinlaug's express prior written approval of her salary reduction and relocation from France to the United States, Claire's did not actually relocate her or reduce her salary. To support her position that Claire's did relocate her and diminish her salary, Kvinlaug points to an email that DeFalco sent her on January 29, 2009. Doc. 196-2 at 1. The email conveys the company's "offer" to Kvinlaug of the Southwest TVP position; the offer expresses the "hope" that Kvinlaug would "accept," indicates that Kvinlaug's salary would be "[c]ommensurate with salary level of other TVPs," and states that her location would "[o]ptimally" be "within the boundaries" of the Southwest region but that Kvinlaug could "choose" to reside in Atlanta. Joint Exh. 9. On the last point, the email adds as a "point of

-36-

clarification" that "we are changing your place of employment from Europe, not Atlanta, to the US, not to Dallas specifically, which is consistent with the terms of your TPA and your 'side letter' [the Addendum]." *Ibid.*

As the email makes clear, Claire's merely *offered* Kvinlaug the Southwest TVP position; it did not *require* Kvinlaug to accept. Kvinlaug's alternative was to reject the TVP position and continue as EGVP in Paris. Kvinlaug chose that alternative; after she rejected the TVP offer, Claire's allowed her to continue to work in Paris through June 10, 2009, at her $300,000 annual salary. Kvinlaug separated from Claire's due to her resignation, not because she was fired. Under these circumstances, it cannot be said that Claire's relocated Kvinlaug or reduced her salary, which defeats Kvinlaug's claim for Good Reason benefits under §§ X(2) and X(3). *See Collins v. Ralston Purina Co.*, 147 F.3d 592, 600 (7th Cir. 1998) ("[Plaintiff] *anticipated* his reassignment, but he avoided the possible step backwards in his career by resigning before the company's offer could become an ultimatum. Leaving the company at that point may have made perfect sense, but the agreement was conditioned on an actual—not anticipated—reduction in his job responsibilities.").

### Conclusion

For the foregoing reasons, Kvinlaug did not have Good Reason to resign and therefore is not entitled to recover TPA benefits. Judgment will be entered in favor of Claire's and against Kvinlaug. In its proposed conclusions of law, Claire's requests an award of attorney fees and costs under 29 U.S.C. § 1132(g)(1). Doc. 192 at pp. 140-141. If Claire's wishes to seek such an award, it must do so consistent with the procedure set forth in *Bender v. Freed*, 436 F.3d 747,

749-50 (7th Cir. 2006). *Accord, LaAsmar v. Phelps Dodge Corp. Life, Accidental Death &*

*Dismemberment and Dependent Life Ins. Plan*, 605 F.3d 789, 815-16 (10th Cir. 2010).

March 22, 2013

_____

United States District Judge